**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COREY SAMUEL,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 19-2203** |
| | : | |
| **TARGET REALTY, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM OPINION</u>**

**Goldberg, J.**                                                                                      **October 13, 2021**

Plaintiff Corey Samuel has sued his former employers, Defendants Target Realty, LLC and its owner Li Zhao, alleging employment discrimination under Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, the Pennsylvania Human Relations Act, and the Philadelphia Fair Practices Ordinances. Defendants seek summary judgment on all claims. For the following reasons, I will grant the Motion in its entirety.

**I.     UNDISPUTED FACTS**

Plaintiff's claims stem from his employment as a property manager for Defendants' properties. Plaintiff alleges that, during the course of that employment, he suffered various adverse working conditions and was subjected to racially-offensive comments and conduct. He contends that he faced a hostile work environment and was constructively discharged from his position.

The following facts of record are undisputed unless otherwise noted.[1]

---

[1]     References to the parties' submissions will be made as follows:  Defendants' Statement of Undisputed Facts ("DSUF") and Plaintiff's Response ("PR").  To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions.  If a statement is disputed and can be resolved by reference to the exhibits, I will cite the supporting exhibits.  I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

A.      **The Parties' Relationship**

Defendant Target Realty, LLC ("Target Realty") provides real estate brokerage and property management services.  (DSUF ¶ 1; PR ¶ 1.)  Target Realty is owned and managed by Defendant Li Zhao.  (DSUF ¶ 2; PR ¶ 2.)

In early 2016, Zhao hired Plaintiff, an African American man, as a "property manager."  This position included tasks such as cleaning the halls, watering the plants, dealing with contractors, picking up needed supplies, running showings, making phone calls for repairs, taking money from tenants, and shoveling.  (Pl.'s Ex. A, Dep. of Corey Samuel ("Samuel Dep.") 239:1–18.)  In addition, Plaintiff performed basic maintenance, swept common areas, and maintained landscapes.  (DSUF ¶ 4; PR ¶ 4; Defs.' Ex. B, Dep. of Li Zhao ("Zhao Dep.") 68:15–69:1.)  Although Zhao provided Plaintiff with a maintenance/cleaning schedule for the various properties, Plaintiff did not have a set number of weekly hours and was paid $500 biweekly regardless of hours.  (Zhao Dep. 84:6–87:23; 95:8–96:16.)  In addition, Plaintiff would, on an as-needed basis, clean AirBnb apartments managed by Target Realty, for which he was paid an amount above his $500 per week rate.  (Id. at 95:8–12, 96:18–24.)

Plaintiff testified that Zhao was his sole supervisor.  He explained, "She's the one that paid me. She's the one that told me what needed to be done."  (Samuel Dep. 238:19–239:3; 244:7–12.)

Another man by the name of Alex George ("George") also did work for Zhao.  As a licensed real estate agent in Pennsylvania, George testified that he was an independent contractor and that his job responsibilities for Target Realty included writing leases, showing houses, representing clients, and managing the Airbnb properties.  ((Pl.'s Ex. C, Dep. of Alex George ("George Dep.") 14:17-21, 19:11–16, 29:6–30:18, 32:18–33:7.)  With respect to the Airbnb properties, Zhao explained that those belonged to her, but George was responsible for managing them and telling Plaintiff what needed to be cleaned.  (Zhao Dep. at 121:4–122:7.)  George did not otherwise know anything about Plaintiff's specific tasks, his schedule, or his rate of pay.  (Pl.'s Ex. C, Dep. of Alex George ("George Dep.") 39:

11–21; 41:13–42:16.)  On occasion, George would relay to Plaintiff certain jobs that needed to get done with respect to the non-Airbnb properties.[2]  (Id. at 40:9–20.)

### B.   Alleged Discriminatory Rental Policy

Plaintiff testified that Zhao never said anything discriminatory to him.  (Samuel Dep. 246:11–13.)  Plaintiff emphasized that she "[n]ever said nothing bad about me, because if she—if I did anything wrong, if she said anything bad about me, she would have been let me go a long time ago.  I left on my own terms."  (Id. at 62:3–9.)

Plaintiff alleges, however, that Zhao engaged in discrimination by renting an apartment to George, but not to Plaintiff.  Prior to beginning his work for Target Realty as a property manager in 2014, George had been renting an apartment from Target Realty.  (DSUF ¶ 12; PR ¶ 12.)  When Plaintiff asked about also renting an apartment, Zhao told him he did not make enough money to rent from her, a decision he simply accepted without further argument.  (Samuel Dep. at 143:20–145:9.)

Plaintiff explains that when he told George that Zhao did not want to rent to him, George responded, "Corey, she say she's not turning this into the hood or the ghetto."  (Id. 98:6–19.)  When Plaintiff told Zhao what George said, she denied saying it.  (Id. at 98:20–23.)  Zhao testified that Plaintiff never approached her about renting any of her properties and, had he done so, she would have had him fill out the application, including amount of income, and credit check.  (Zhao Dep. 130:11–131:17.)  George indicated that Plaintiff stated that he "would never want to rent an apartment from [Zhao] because he didn't want to be in debt to her."  (George Dep. 58:13–22.)

In June 2017, an African American man driving a Bentley asked about an apartment owned by Defendants, after having been shown the apartment once before.  (DSUF ¶ 16; PR ¶ 16.)  George told

---

[2]      In his brief in opposition to Defendant's Motion, Plaintiff significantly mischaracterizes George's testimony.  For example, Plaintiff asserts that Mr. George instructed Plaintiff as to daily tasks and tenant requests.  Mr. George actually testified that he knew nothing about Plaintiff's schedule and that Zhao would give him specific tasks, but that, "occasionally" George would relay to Plaintiff certain jobs that needed to get done if Plaintiff was going to be at a specific building.  (George Dep. 39:11–40:20.)

Plaintiff that Zhao was not going to rent to him because he (George) was showing the property to other people for short-term rentals as if it was his own, and the Target Realty leases prohibited such activity. (George Dep. 80:9–84:4.)  Plaintiff testified that he talked to Zhao, and she asked what the potential renter looked like.  According to Plaintiff, after he described him, Zhao stated that the man would not be able to rent that unit.  (Samuel Dep. 140:1–141:11.)  George, Zhao, and another Target Realty employee, Ying Huang, all testified that rental determinations were never based on race.  (DSUF ¶¶ 18–19; PR ¶¶ 18–19.)

C.       **Discriminatory Comments by George**

Plaintiff indicated that even though he was friendly with George, George had no qualms saying things like, "Well . . . 'ni\*\*er this,'" and "ni\*\*er that'" right to his face, although Plaintiff knew that George was not calling him "ni\*\*er" personally.  (Pl.'s Ex. E, Aff. of Corey Samuel ("Samuel Aff") ¶ 9.)  On one occasion, on June 23, 2017, Plaintiff invited George to lunch.  George stated, "What are you going to have?  You black people love chicken."  (Id. ¶ 9.)  Moments later, George texted Plaintiff a YouTube link to a video of a skit by African American comedian Dave Chappelle, where a blind African American man portrays a member of a white supremacist group eating fried chicken.[3]  (Id.)  Although Plaintiff did not tell George that he thought the video was inappropriate, (DSUF ¶ 22; PR ¶ 22), he testified that he expressly told Zhao that George made a lot of racist comments and sent him the Dave Chappelle video.  (Samuel Dep. 90:1–96:7.)

In late June 2017, Plaintiff was already in contact with the law firm currently representing him in this discrimination action.  (DSUF ¶ 24; PR ¶ 24.)  On June 25, 2017, Plaintiff and his wife prepared a handwritten summary meant to document all his issues with Target Realty and Ms. Zhao as of that date.  (DSUF ¶ 26; PR ¶ 26.)  This summary did not identify any racist comments made by George.

---

[3]       George testified that he did not recall any conversation with Plaintiff about chicken and that he sent the video clip because both he and Plaintiff liked Dave Chappelle and George thought Plaintiff would want to see it.  (George Dep. 66:9–67:2.)

(DSUF ¶ 27; PR ¶ 27.)  When asked why the summary did not describe any of the incidents with George, Plaintiff testified, "[b]ecause he's [George] not saying anything about—he's not saying the N word, not saying nothing about black people or anything."[4]  (Samuel Dep. 150:13–15.)

### D.   The Apartment Cleaning

In July 2017, an apartment at one of Target Realty's properties required cleaning after a tenant committed suicide.  (DSUF ¶ 32; PR. ¶ 32.)  According to Plaintiff, Zhao called him and told him she needed him to go to the property and do a light cleaning, but when he got there and opened the door, a strong odor hit him.  (Samuel Dep. 57:18–58:13.)  Plaintiff called Zhao and said he would do it the next day, at which point she informed him that he needed to do it right away because the tenant had committed suicide.  (Id. at 58:13–18.)  Plaintiff responded that he could not clean an apartment where there had been a death because he had witnessed his mother being killed.  (Id. at 59:19–60:3.)

Zhao then asked Plaintiff to find a cleaner and stated that she would pay more money because new tenants were coming the following Monday.  (Def.'s Ex. H, p. 37.)  Although Plaintiff said he would call for a cleaner, ultimately he and one other person ended up cleaning the apartment.   (Id. at 38.)  Zhao texted, "Great job . . . I really appreciate," to which Plaintiff responded, "Thank you Lily, this was the worst job today ever."  (Id. at 39--41.)  At his deposition, Plaintiff admitted that this job had nothing to do with racism on Zhao's point and that he was just doing jobs that needed to be done. (Samuel Dep. 193:1–3, 68:21–3.)  He believed, however, that some of the jobs Zhao asked him to do were "disrespectful" because he needed a team to do them.  (Id. at 68:6–69:11.)

---

[4]     Plaintiff was also asked about his own history of using racist language.  He admitted that during his prior work at a construction company, he would record "skits" with his coworkers that, among other things:  referred to African American women as "ni**er b*tches" and "welfare b*tches"; stated "What the f*ck is wrong with Dominican men, think all of them is gay"; and mocked the Jamaican accent while suggesting Jamaicans were drug dealers.  (DSUF ¶ 29; PR 29.)  Plaintiff testified that it was different for a black person to use the word "ni**er" and for a non-black person to use that word. (Samuel Dep. 157:23–158:4.)

E.     **The Stuffed Monkey Incident**

On August 5, 2017, Plaintiff alleges that he entered a rental unit that was vacated the day before and saw a stuffed monkey hanging from a noose.  (DSUF ¶ 37; PR ¶ 37; Pl's Exs. J & K.)  Plaintiff called Zhao and George, as well as the son of Mr. Hung, who, according to Plaintiff, is one of Zhao's employees who set cleaning schedules.  Everyone denied being involved.  (Samuel Dep. 222:1–13.) Mr. Hung's son told Plaintiff that he had done a showing at 7:00 p.m. the night before but did not see anything.  (Id.)  Plaintiff asked both George and Mr. Hung (who also worked for Zhao) to take it down, but neither one came to the apartment.  (Id. at 222:17–24.)  Plaintiff told Zhao the display was "racist" and that "being a black man, I'm not taking it down."  (Id. at 256:17–20.)    Plaintiff then called the police to file a report.  (Id. at 223:21–224:4.)  Plaintiff did not think that Zhao hung the monkey or that she wanted this to happen.  (Id. at 224:14–22.)

A few days later, Mr. Hung showed up after Zhao asked him to take down the monkey.  When Hung arrived, however, he laughed and pointed at Plaintiff and said, "It looks like you."  (Id. at 225:2– 10.)  The monkey remained hanging, and Plaintiff checked back on the apartment every day.  On August 11th, he noticed someone had added a banana to the display.  (Id. at 254:17–255:7.)

Plaintiff's texts with Zhao for the following month related solely to his job duties or requests for days off, with no additional mention of the stuffed monkey or any type of discrimination.  (DSUF ¶ 46; PR ¶ 46.)  On September 5, 2017, Plaintiff texted Zhao stating, "Hi lily I need the day off to take care of some family issues, can I come into the office later to pick up pay."  (DSUF ¶ 48; PR ¶ 48). The following morning, Plaintiff texted, "Lily [Zhao] I will not be returning to work for you any longer, I put all the key's inside the camera room 1215."  (Id.)  Zhao responded, "Ok" and "U should tell me earlier so I can find another person."  (Id.)  When Plaintiff texted that he told George, Zhao replied, "He never tell me.  But it is fine Corey.  I know u need take care ur family.  No problem.  You did good job.  Thank you."  (Id.)

Plaintiff later testified that he had planned on quitting if the stuffed monkey on the noose was not taken down within thirty days, but he never told Zhao about his intentions.  (Id. at 260:24–261:17.) Plaintiff also testified that his job was taking "a toll on [his] family"[5] because he was "spending more time at work than being at home."  (Id. at 265:8–21.)

On May 21, 2019, Plaintiff filed a Complaint against Defendants.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality."  Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine

---

[5]     Plaintiff again mischaracterizes the deposition testimony.  In his response to Defendant's Statement of Undisputed Facts, Plaintiff asserts that he left because the monkey incident was "[taking] a toll on [his] family" and causing arguments in his household.  (PR ¶ 50.)  Plaintiff actually testified that his job and the number of hours he was working was taking a toll on his family.  The monkey incident is not referenced in this portion of his testimony.  (Samuel Dep. 265:8–21.)

issue in rebuttal.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.   DISCUSSION

### A.   Claims Under Title VII

Defendants first allege that they are entitled to summary judgment on all claims under Title VII because that statute applies only to organizations which have fifteen or more employees.  They contend that Target Realty has less than fifteen employees.

Under Title VII, an "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). The United States Court of Appeals for the Third Circuit has explained that a "significant purpose of the fifteen-employee minimum in the Title VII context is to spare small companies the considerable expense of complying with the statute's many-nuanced requirements. This goal suggests that the fifteen-employee minimum should be strictly construed." Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 85 (3d Cir. 2003) (internal citation omitted).

The fifteen-employee definition in Title VII is an element of a plaintiff's claim for relief. Arbaugh v. Y&H Corp., 546 U.S. 500, 515--16 (2006).  Thus, to withstand a motion for summary judgment, a plaintiff must present "specific facts showing a genuine issue for trial" regarding this element. Pasquale v. General Sciences, Inc., No. 09-cv-1735, 2010 WL 1558717, at *4 (E.D. Pa. Apr. 19, 2010).  In determining whether an employer employs fifteen or more employees, courts apply the "payroll method," which looks to the number of employees engaged in an employment relationship with the employer on each work day in each of twenty or more calendar weeks in the current or

preceding calendar year.  See Walters v. Metro. Educ. Enters., 519 U.S. 202, 206--07 (1997).  "Merely being on payroll, however, is not dispositive of the issue of whether an individual is an 'employee.'"  Pasquale, 2010 WL 1558717, at *5.  "Rather, the ultimate criterion is the existence of an employment relationship.  Thus, an individual who appears on the payroll, but who is not an 'employee' under traditional principles of agency law, would not count toward the 15-employee minimum."  Id. (quoting Babich v. Mgmt. & Tech. Res., No. 06-cv-1502, 2008 WL 356480, at *3 (W.D. Pa. Feb. 6, 2008)).

Here, Zhao testified that, in 2017, Target Realty had two other employees aside from her, Zhao's secretaries Ping and Fen.  (Zhao Dep. 28:16–29:15.)  Additionally, although there is some dispute as to whether George and Plaintiff were independent contractors or employees, I assume, for purposes of summary judgment, that they could be classified as employees, thereby bringing the total to five.  This total falls short of the fifteen employees required for a party to be deemed an "employer" under Title VII.

In an effort to create an issue of material fact on this question, Plaintiff cites to several other pieces of evidence:

- Plaintiff testified that Zhao "had a lot of guys" or "construction contractors" that "were doing the buildings, like doing the property building," plus all the people in her office.  (Samuel Dep. 239:4–239:21.)  He estimated that she had "about a total of 30-something people that [he] knew of, that [he] seen that actually worked for her."  (Id. at 239:22–240:7.)  Only "Alex [George] and Greg" were around every day.  (Id. at 240:3–7.)

- George testified to "other employees" at the company that helped him, including "Amanda, Fen, and . . . Lily," plus there was Ying, Yun Lao, Kerry Zhao, and Derrick Din who were agents or brokers, Mr. Hung and his son who were the maintenance men along with Plaintiff, and Gladys Flores, a cleaner.  (George Dep. 24:12–28:15.)

- Zhao testified that Derrick Din worked as her office manager, and she had a man named Bob who would send over people to clean units at Zhao's request.  (Zhao Dep. 347:7–1, 139:5–6.)

Based on this testimony, Plaintiff argues that "[c]ompiling these names, it is clear that Ms. Zhao actually employed, at a minimum of twelve employees, including herself and Mr. Samuels, not taking into consideration the unnamed maintenance employees." (Pl.'s Opp'n 6.)

Such testimony falls short of Plaintiff's summary judgment burden of "present[ing] specific facts showing a genuine issue for trial." Pasquale, 2010 WL 1558717, at *4. Plaintiff can only identify twelve individuals, merely naming people who, on occasion, performed work for Target Realty. This does not equate with proof that Target Realty had fifteen or more employees who were on the payroll and maintained an employment relationship during twenty calendar weeks in the relevant calendar year. Indeed, despite having the benefit of discovery, Plaintiff has produced no written discovery answers, no payroll records, and no tax documents that could establish this element. Instead, Plaintiff relies solely on speculative testimony about individuals who, on occasion, performed work in some capacity for Target Realty. As the Third Circuit has held that the employee minimum should be strictly construed, I find that Plaintiff has failed to meet his summary judgment burden on this element and will grant Defendants' Motion as to the Title VII claims.[6]

---

[6] Defendants also contend that Plaintiff has failed to establish the threshold number of employees for purposes of the PHRA. Under the PHRA, the term "employer" includes "religious, charitable and sectarian corporations and associations employing four or more persons within the Commonwealth." 42 P.S. § 954(b).

Defendant has conceded that Target Realty has at least three employees on the payroll: Zhao, Ping, and Fen. Plaintiff has also produced evidence sufficient to create a genuine issue of material fact as to whether there was at least one additional employee. Therefore, I will not dismiss the PHRA claims on this ground. Plaintiff was also asked about his own history of using racist language. He admitted that during his prior work at a construction company, he would record "skits" with his coworkers that, among other things: referred to African American women as "ni**er b*tches" and "welfare b*tches"; stated "What the f*ck is wrong with Dominican men, think all of them are gay"; and mocked the Jamaican accent while suggesting Jamaicans were drug dealers. (DSUF ¶ 29; PR 29.) Plaintiff testified that it was different for a black person to use the word "ni**er" than for a non-black person to use that word. (Samuel Dep. 157:23–158:4.)

###### B.     Discrimination Claims

Plaintiff also brings additional claims for racial discrimination under 42 U.S.C. § 1981, the PHRA, and the Philadelphia Fair Practices Ordinance.   For purposes of assessing these claims, the PHRA and the PFPO have been interpreted in a similar fashion to Title VII.[7] Ahern v. Eresearch Tech., Inc., 183 F. Supp. 3d 663, 668 (E.D. Pa. 2016) (citing Dici v. Commw. Pa., 91 F.3d 542, 552 (3d Cir. 1996) (the PHRA is applied in a similar manner as Title VII); Joseph v. Cont'l Airlines, Inc., 126 F.Supp.2d 373, 376 n.3 (E.D. Pa. 2000) (analysis of a claim under Title VII applies in equal force to the PFPO)).  Likewise, race-discrimination claims brought under Title VII and § 1981 are all analyzed under the same burden-shifting scheme.  Collins v. Kimberly-Clark Pa., LLC, 247 F. Supp. 3d 571, 588 (E.D. Pa. 2017), aff'd, 708 F. App'x 48 (3d Cir. 2017).  Accordingly, I address all of these claims together.

To establish a claim of discrimination, a plaintiff must show that an employer had a racially discriminatory animus against an employee, and that the animus resulted in a challenged action, such as dismissal, failure to promote, or failure to hire.  Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983).  A plaintiff may succeed in a discrimination claim against an employer either by (1) providing direct evidence of unlawful discrimination, or (2) by relying on indirect evidence of discrimination through the McDonnell Douglas burden-shifting scheme.  McIlvaine v. ISEO Techs., Inc., 485 F. Supp. 3d 582, 585 (E.D. Pa. 2020) (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999)).

###### 1.     Direct Evidence of Discrimination

Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without an inference or presumption.  Torres v. Casio, Inc., 42 F.3d 825, 829 (3d Cir.

---

[7]     Although I will dismiss Plaintiff's Title VII claims for failure to establish that Defendants were "employers," I will nonetheless discuss Title VII here for purposes of the legal standards that apply to all of Plaintiff's discrimination claims.

1994) (emphasis omitted).  Direct evidence is described as overt or explicit evidence that directly reflects a discriminatory bias that is causally related to the adverse employment decision.  Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004).  "Stray remarks in the workplace, statements by nondecisionmakers, or even statements by decisionmakers unrelated to decisional process itself, do not constitute direct evidence of discrimination."  Hodges v. UPMC Presbyterian Shadyside Hosp., No. 05-cv-1310, 2007 WL 654319, at *3 n.2 (W.D. Pa. Feb. 27, 2007) (quoting Fakete v. Aenta, Inc., 152 F. Supp. 2d 722, 733 (E.D. Pa. 2001).  When providing discrimination through direct evidence, a plaintiff faces a "high hurdle."  Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998).

Plaintiff has produced no direct evidence of discrimination by Defendant Zhao.  Indeed, he specifically testified that Zhao never said anything discriminatory to him.  And, Plaintiff has not identified any remarks by Zhao related to any contested employment decision.

To the extent Plaintiff suggests that statements by Alex George constitute direct evidence of discrimination, I find no merit to this argument for two reasons.  Primarily, Plaintiff has failed to produce any evidence that George was Plaintiff's "supervisor."  The United States Supreme Court has held that an employee is a "supervisor" if "he or she is empowered by the employer to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  Vance v. Ball State Univ., 570 U.S. 421, 431 (2013) (quotation omitted).   No evidence exists that George had the authority to effectuate any such decisions with respect to Plaintiff's employment.  Indeed, Plaintiff expressly testified that Zhang was his sole supervisor and that "[s]he's the one that paid me.  She's the one that told me what needed to be done."  (Samuel Dep. 238:19–239:3; 244:7–12.)  While George managed all the Airbnb properties and set the rates of pay for cleanings, (Zhao Dep. 121:4–122:7), George did not know anything about Plaintiff's specific tasks, his schedule, or his regular rate of pay.  (George Dep. 39: 11–21; 41:13–42:16.)

Moreover, even if George could be characterized as a supervisor, the discriminatory statements that Plaintiff attributes to him are unrelated to any contested employment decision.  Rather, these statements constitute "stray remarks" that do not rise to the level of direct evidence of discrimination.

Accordingly, I find that Plaintiff has failed to produce any direct evidence on which a factfinder could conclude that discrimination occurred.

### 2.    McDonnell Douglas Burden-Shifting

Absent direct evidence of discrimination, a plaintiff must rely on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff must prove by a preponderance of evidence a *prima facie* case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  Next, if the plaintiff establishes a *prima facie* case of discrimination, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action.  Id. at 802–03.  To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981).  Rather, the defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons.  Id.  Finally, if the employer meets its burden of production, the plaintiff bears the ultimate burden of convincing the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue.  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

To establish a *prima facie* case of racial discrimination, a plaintiff must show that he (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410–11 (3d Cir. 1999).  Defendants do not dispute that Plaintiff, as an African American man, is a member of a protected class and that he was

qualified for his position with Target Realty.  At issue here are the third and fourth elements of the *prima facie* case.

Under the third element, "[t]he Supreme Court has interpreted 'adverse employment action' to mean 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  Remp v. Alcon Labs., Inc., 701 F. App'x 103, 106-07 (3d Cir. 2017) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  In the context of a discrimination claim, "[a]n adverse employment action involves activity by an employer 'that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"  Reyes v. AutoZone, Inc., No. 08-cv-847, 2009 WL 4559454, at *5 (W.D. Pa. Dec. 2, 2009) (quoting Storey v. Burns Int'l Sec. Servx., 390 F.3d 760, 764 (3d Cir. 2004) (citation omitted)).  "Lateral transfers, changes of title, and different reporting relationships, generally do not constitute adverse employment actions."  Id. (citing Langley v. Merck & Co., Inc., 186 Fed. Appx. 258, 260 (3d Cir. 2006)).  Likewise, "[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action."  Homel v. Centennial Sch. Dist., 836 F. Supp. 2d 304, 323 (E.D. Pa. 2011) (quoting Clegg v. Ark. Dept. of Corrs., 496 F.3d 922, 926 (8th Cir. 2007).

Under the fourth element, a plaintiff can satisfy his burden by presenting evidence upon which a "court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons."  Equal Employment Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990).  One way that a plaintiff can make such a showing is by demonstrating that he was treated less favorably than similarly situated employees outside of the protected class.  Jones, 198 F.3d at 413.  Alternatively, a plaintiff may "rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse

employment action." Greene v. Virgin Islands Water & Power Auth., 557 F. Appx. 189, 195 (3d Cir. 2014).

Defendants allege—under the third and fourth elements—that Plaintiff suffered no adverse employment action under circumstances giving rise to an inference of discrimination. Plaintiff responds that he has produced adequate evidence to allow a factfinder to conclude that, as a result of his race, he suffered a litany of adverse actions by Defendants, ultimately leading to his constructive discharge. I consider each of his various allegations individually.[8]

### a.    Being Paid Less for AirBnB Cleanings

Plaintiff first alleges that he was paid "less than his non-black co-workers for the same work." (Pl.'s Opp'n 17.) Specifically, he asserts that although Zhao promised him $75 per cleaning of Airbnb rentals, he did not receive that rate while another non-African-American woman, Gladys Flores, did. According to Plaintiff, such an inequity rises to the level of an adverse employment action because it had a negative effect on his paycheck.

The Third Circuit has recognized that although a discriminatory salary disparity can establish an adverse employment action, the plaintiff must present evidence from which a reasonable trier of fact could find that the salary disparities were the result of race discrimination. Mieczkowski v. York City Sch. Dist., 414 F. App'x 441, 446 (3d Cir. 2011). To do so, a plaintiff must show that the relevant aspects of the plaintiff's employment situation are "nearly identical" to those of co-workers that plaintiff alleges were treated more favorably. Collins v. Kimberly-Clark Pennsylvania, LLC, 247 F.

---

[8]    Plaintiff expands on some of his allegations in an affidavit attached to his Response brief. Notably, self-serving affidavits may not be used by a party to create a genuine issue of material fact. Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009); Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002). In connection with a motion for summary judgment, "the affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant's burden." Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir. 1985) (internal quotation marks omitted). To the extent Plaintiff's affidavit conflicts with his deposition testimony, it constitutes a sham affidavit and may not be used to defeat summary judgment. Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).

Supp. 3d 571, 589 (E.D. Pa.), aff'd, 708 F. App'x (3d Cir. 2017).  In determining whether "similarly situated" employees were treated more favorably, we focus on "the particular criteria or qualifications identified by the employer as the reason for the adverse action."  Simpson v. Kay Jewelers, 142 F.3d 639, 647 (3d Cir. 1998).  The plaintiff bears the burden of establishing that similarly-situated individuals were treated differently.  Warfield v. SEPTA, No. 10-cv-3023, 2011 WL 1899343, at *5 (E.D. Pa. May 19, 2011), aff'd, 460 F. App'x 127 (3d Cir. 2012).

Here, the evidence presented reflects that Defendants Zhao and Target Realty hired Plaintiff for maintenance and cleaning of various rental properties and paid Plaintiff $500 on a biweekly basis. In addition, Plaintiff would, on an as-needed basis, clean Airbnb apartments managed by Target Realty, for which he was paid an amount above his $500 per week rate.  (Zhao Dep. 96:18–24.)  George, who managed the Airbnb properties for Zhao, set the cleaning rate for those properties.  A Latina woman by the name of Gladys Flores was paid $75 per cleaning.  (George Dep. 60:9–18, 65:6–10.)  George explained that Plaintiff received only $50 a cleaning because "he also was getting paid an hourly wage and Gladys was not.  So when it all broke down, he was receiving about the same as she was because he was making an hourly wage and she was not."  (Id. at 60:18–22.)  Zhao likewise testified that because the Airbnb cleanings interfered with the time Plaintiff would spend doing his regular job responsibilities, she also believed $50 was fair.  (Zhao Dep. 134:8–24.)

Absent any additional evidence regarding Flores's terms of employment—e.g., whether she was performing the same work or whether she was also receiving an hourly wage on top of the cleaning fee like Plaintiff—a factfinder could not reasonably conclude that the salary disparities were a result of racial discrimination.

### b.    *Weekends Off to Non-Black Co-Workers*

Plaintiff's second alleged material adverse action involves his work schedule.  According to Plaintiff:

> Defendants gave weekends off to its non-black co-workers, but not Mr.
> Samuel.  Indeed Mr. Samuel testified "[e]veryone else in the office
> has Saturdays off . . . I didn't get that same opportunity."  Ex. A.,
> Samuel Dep. at 78:21-23.  In fact, Defendants' posted on the door of
> each resident Mr. Samuel's personal contact information in the event
> of "after office hour" emergencies.  *See* Ex. B., Zhao Dep., 118:11-21;
> *See also* Ex. I.

(Pl.'s Opp'n 18.)

Again, however, Plaintiff offers no evidence to establish that the relevant aspects of his

employment situation were "nearly identical" to those of co-workers that were treated more favorably.

Collins, 247 F. Supp. 3d at 589.  Although the more favorable treatment of a similarly-situated

individual outside of the protected class may give rise to an inference of unlawful discrimination, an

employee who holds a different job in a different department is not similarly situated.  Mandel v. M &

Q Packaging Corp., 706 F.3d 157, 170 (3d 2013).

According to the evidence, Plaintiff's job included general maintenance and cleaning of the

various rental units and common areas, including handling emergency repairs.  (Zhao Dep. 68:7–20.)

Zhao explained that Plaintiff's schedule was his own as long as he completed his jobs, and on some

days he had nothing to do.  (Id. at156:13–157:13.)   Plaintiff has produced no evidence about the

identity or race of the disparately-treated co-workers, let alone indicated whether or not they had

similar job responsibilities that would allow them to take off on a weekend.   Indeed, Plaintiff's

statement that they worked in the "office" suggests that they did not perform similar maintenance

duties.  Based on this evidence, a factfinder could not reasonably find an adverse employment action

occurring under the circumstances that give rise to an inference of discrimination.

### c.    Rental of Apartment

Plaintiff's third claim in support of his *prima facia* case asserts:

> Zhao would rent her apartments to Mr. George, a white employee, but
> refused to rent one to Mr. Samuel.  Ex. A., Samuel Dep. at 60:6–10.
> Indeed, Mr. Samuel testified "[Zhao] didn't want to rent me an
> apartment . . . she told me I couldn't afford [to] live in one of her units,
> [even] [one] [of] the cheaper units.  Ex. A., Samuel Dep. 6-"6–10.

> Further, Mr. Samuel testified "[Mr. George] got to take as many vacations as he wanted.  He got to live in one of [Zhao's] units.  I didn't. Id. at 78:8–11.  Additionally, Mr. Samuel testified "[Zhao] told [Mr. George] [she] [did] not want to turn Noble Street into the hood or the ghetto."  Id. at 60:11–13.  Mr. Samuel testified "[Zhao] renting an apartment to [Mr. George] and not me, and both work for her.  That's racial discrimination . . . [Zhao] didn't even accept my application." Id. at 62:18–22.

(Pl.'s Opp'n 18.)

Plaintiff's argument is not enough to deflect summary judgment for two reasons.  First, a denial of a discretionary benefit or the opportunity for discretionary income does not rise to the level of an adverse employment action because it is not a component of the employee's compensation, terms, conditions, or privileges of an employment, and cannot be considered an entitlement.  Mitchell v. MG Indus., Inc., 822 F. Supp. 2d 490, 498 (E.D. Pa. 2011).  Here, George had rented an apartment from Target Realty prior to ever beginning work for the company.  Rental of an apartment was not a privilege of George's or Plaintiff's employment or otherwise part of their compensation.  Accordingly, any refusal to rent an apartment to Plaintiff as an employee of Target Realty could not constitute an adverse employment action.

Moreover, Plaintiff has not identified any circumstances giving rise to an inference of discrimination.  Plaintiff testified that, during a single conversation with Zhao, Plaintiff said he wanted to rent an apartment on site.  Plaintiff told her that she could just take the rent out of his paycheck and he would be there to manage the building.  (Samuel Dep. 97:9–18, 144:10–145:10.)  When Zhao replied that Plaintiff did not make enough money to rent from her, Plaintiff did not argue, just accepted her answer, and did not tell her that her comment made him uncomfortable.  (Id. at 144:20–145:9.) Because Zhao said no, Plaintiff never went forward with filling out an application and supplying information about his income and credit.  (Id.)  Absent evidence that Plaintiff filled out an application and was rejected, or that Zhao bluntly refused to rent to him regardless of income, there is no reasonable inference that this conversation was racially motivated.

### d.   More Arduous Tasks

Plaintiff next contends that Zhao assigned him more arduous tasks than non-black employees such as shoveling 4,500 square feet of snow in multiple buildings with no one to help him and cleaning up after a tenant's suicide without giving him a "heads up."

This allegation again fails to meet Plaintiff's burden of establishing a *prima facie* case of discrimination. "Excessive or unfavorable work assignments are not material adverse changes in terms and conditions of employment." Siroy v. Jobson Healthcare Info. LLC, No. 16-cv-4523, 2019 WL 1598021, at *7 (D.N.J. Apr. 19, 2019) (citing Fridia v. Henderson, No. 99-cv-10749, 2000 WL 1772779, at *7, (S.D.N.Y. Nov. 30, 2002) (finding that an allegation of excessive work does not constitute materially adverse changes in the terms, conditions, or privileges of employment); Katz v. Beth Israel Med. Ctr., No. 95-cv-7183, 2001 WL 11064, *14, (S.D.N.Y. Jan. 4, 2001) ("Being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions.")).

Moreover, Plaintiff admitted that Zhao asked him to do these jobs not because of racism, but because they needed to be done.  (Samuel Dep. 68:6–69:11; 193:1-4.)  He objected to them only because he believed that the jobs were too much for one person.  (Id.)  Given this testimony, no issue of fact exists as to whether these tasks were an adverse employment action made under circumstances giving rise to an inference of discrimination.

### e.   Constructive Discharge

In his final allegation, Plaintiff contends that the racial comments by his co-worker George and the incident with the stuffed monkey in the noose each resulted in a "constructive discharge" wherein he felt that he had no choice but to terminate his employment with Target Realty.

"Unless there is a claim for 'constructive discharge,' an employee's voluntary resignation does not constitute an adverse employment action."  Larochelle v. Wilmac Corp., 210 F. Supp. 3d 658, 705 (E.D. Pa. 2016).  To establish a constructive discharge, "a plaintiff must prove first that he was

discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign." Green v. Brennan, 136 S. Ct. 1769, 1777 (2016); see also Mandel v. M&Q Packaging Corp., 706 F.3d 157, 169 (3d Cir. 2013) (to prove constructive discharge, an employee must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." (quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996)). The court must employ an objective test and "thus an employee's subjective perceptions of unfairness do not govern a claim of constructive discharge." Mandel, 706 F.3d at 169. In determining whether an employee was forced to resign, the court should consider a number of factors, including "whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations." Id. at 170. Ultimately, the conduct complained about must have "surpasse[d] a threshold of intolerable conditions." Wiest v. Tyco Elecs. Corp., 812 F.3d 319331 (3d Cir. 2016) (quotations omitted).

"To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 n.4 (3d Cir. 2006) (quotations omitted). Although the Third Circuit has declined to "state as a broad proposition of law that a single non-trivial incident of discrimination can never be egregious enough to compel a reasonable person to resign," a plaintiff may "face a more difficult burden of proof in establishing the employer's liability, when relying on a single discriminatory incident as a basis for arguing the occurrence of constructive discharge." Levendos v. Stern Entm't, 860 F.2d 1227, 1232 (3d Cir. 1988). "[A] reasonable employee will usually explore . . . alternative avenues [such as requesting to be transferred, advising the employer of the need to leave if changes are not made, or filing a grievance] thoroughly before coming to the conclusion that resignation is the only option." Clowes v. Allegheny Valley Hosp., 991 F.2d 1159,

1161 (3d Cir. 1993).  While the Third Circuit does not require an employee to take such steps in all

cases, the employee should "be able to show working conditions were so intolerable that a reasonable

employee would feel forced to resign without remaining on the job for the period necessary to take

those steps."  Id. at 1161 n.6.

Courts addressing cases with isolated, non-trivial discriminatory incidents have reached

differing conclusions at the summary judgment stage, depending on the particular facts at issue.  In

Woodard v. PHB Die Casting, 255 F. App'x 608 (3d Cir. 2007), the Third Circuit affirmed a grant of

summary judgment on a hostile work environment claim[9] also involving highly offensive

circumstances.  There, the plaintiff alleged that, over the course of five years, he heard second-hand

about several allegedly racist comments by co-workers and that he was given less favorable job

assignments.  Id. at 608-09.  He further testified that (a) he saw a burning cross and KKK sign on a

bathroom wall, and management failed to have it removed for at least three months after he reported

it; (b) he was told by co-workers about blatantly racist comments made by other co-workers; and (c)

more ambiguous racially-charged comments were directed to him by co-workers.  Id. at 609.

Following the District Court's grant of summary judgment on his disparate treatment and hostile work

environment claim, the Third Circuit affirmed noting that while the KKK-related graffiti and the

employer's failure to remove it promptly were serious, "this one incident, even in conjunction with the

other comments, was not enough for a trier of fact to conclude that discriminatory conduct in the

workplace amounted to a change in the terms or conditions of [the plaintiff's] employment."  Id. at

610.

---

[9]     Although this case involved a hostile work environment claim as opposed to a claim of
constructive discharge, the Third Circuit has explicitly held that "[t]o prove constructive discharge, the
plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum
required to prove a hostile working environment."  Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311,
317 n.4 (3d Cir. 2006).   As such, to the extent certain facts would not support a hostile work
environment claim, they could also not support a constructive discharge claim.

Likewise, in <u>Larochelle v. Wilmac Corp.</u>, 210 F. Supp. 3d 658 (E.D. Pa. 2016), the district court granted summary judgment on a hostile work environment claim. The plaintiff's supervisor told plaintiff that he was going to request that she work on his wing because she did not talk "'ghetto' like every other Ni\*\*er there" and she was "going to be Rehab's House Ni\*\*er." <u>Id.</u> at 670. When the plaintiff reported the statements to a superior, he told her the supervisor was "just joking and that Plaintiff shouldn't take it so seriously." <u>Id.</u> The court granted summary judgment finding that "[w]here no serious or severe incidents occur, an individual cannot rely upon casual, isolated or sporadic incidents to advance a hostile work environment claim," even where "the acts of harassment alleged are verbal utterances or racial epithets." <u>Id.</u> at 695. Although the court deemed the alleged remarks troubling, it noted that the plaintiff could not specifically identify any other incidents of continued racial harassment. Absent a clear pattern or incident of harassment, the court dismissed the claim. <u>Id.</u>

Finally, the Sixth Circuit granted summary judgment on a hostile work environment claim in <u>Reed v. Procter & Gamble Mfg. Co.</u>, 556 F. App'x 421 (6th Cir. 2014). There, the plaintiff, an African-American man, testified that he was sitting at his desk when his supervisor walked in, took a telephone cord out of a drawer, and then stood behind the plaintiff. <u>Id.</u> at 425. The plaintiff then heard another co-worker laugh and ask the supervisor, "Are you fixing to hang someone?" after the supervisor made a noose with the cord. <u>Id.</u> The plaintiff also overheard a white co-worker comment to another white employee about eating "watermelon and fried chicken." <u>Id.</u> at 433. Following the district court's grant of summary judgment on the hostile work environment claim, the Sixth Circuit affirmed and found that the combined effect of these incidents was not sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. <u>Id.</u> at 433-34. Although the court deemed the co-worker's comments offensive, the court noted they were not "particularly serious or threatening" and thus fell into the non-actionable "offensive utterance" category. <u>Id.</u> at 433. While

the court remarked that the telephone cord incident was "much more troubling," it found that it was "isolated" and that the employee "did not directly accost or threaten" the plaintiff.[10] Id. at 433.

By contrast, in Nuness v. Simon & Schuster, Inc., 325 F. Supp. 3d 535 (D.N.J. 2018), the plaintiff brought a lawsuit against her employer after one of her co-workers called her a "nigglet" (combining the "n-word" and piglet). Id. at 541. The plaintiff immediately reported the comment and took several days off while her employer investigated the incident. Id. While the employer disciplined the co-worker with a three-day suspension, the employer declined plaintiff's request that either she or the co-worker be moved to a different shift so that they would not have to interact. Id. at 541–42. Three days after the incident, the plaintiff refused to return to work and was terminated. Id. at 543.

Reviewing the plaintiff's claim of constructive discharge, the district court noted that the co-worker's comment was "particularly vicious, disgusting, and offensive." Id. at 557. The court further emphasized that the co-worker's comment was directed at the plaintiff, and not "used in passing to refer to some other person, object or situation (as offensive as that might nevertheless have been)," but rather that the co-worker called her the words in question. Id. at 549. As such, the comments were not

---

[10]    See also Sherrod v. Philadelphia Gas Works, 57 F. App'x 68, 75-77 (3d Cir. 2003) (holding that alleged incidents, including managers making comments that "the way [two African-American employees] were eating at their desks, it must be their culture," and that if such clerks did not do their work, "I'm going to sit at their desks with a whip," were not sufficiently severe and pervasive, even considering the comments in conjunction with other facially neutral alleged mistreatment of the employee where racial slurs were not directed to the plaintiff); Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 838, 844 (8th Cir. 2002) (holding that "racist graffiti-drawings of 'KKK,' a swastika, and a hooded figure" on the walls of the plant bathroom, a racially derogatory "poem" strewn about the plant, and three racially derogatory comments made about plaintiff (but out of his presence) were "neither severe nor pervasive . . ."); Peters v. Renaissance Hotel Operating Co., 307 F.3d 535, 551–52 (7th Cir. 2002) (finding that six incidents in the course of a year and a half, including a reference to black music as "wicka wicka woo music" by a supervisor, a bartender's request to investigate an African-American guest who was allegedly stealing coins from a fountain, other African-American guests being denied additional ice and cups for a party, and one use of the word "nigger" in plaintiffs presence, were not severe or pervasive particularly because they were not directed towards or involving the plaintiff); Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir.1994) (holding that two overtly racial remarks directed at plaintiff, including use of the terms "nigger" and "KKK," distribution of an arguably racial cartoon, and general ridicule and harassment were not severe or pervasive).

"'stray' or 'offhand' which connote a <u>lack</u> of directness avowedly not present here." <u>Id.</u>  In addition, the court recognized that while the plaintiff and the co-worker "did not regularly work closely together, they were exposed to each other in common areas on a daily basis and frequently (albeit not regularly) worked together on the floor." <u>Id.</u> at 557.   Because the employer did not look into the plaintiff's proposed solution of separating shifts, the court found that the plaintiff had raised a genuine dispute of material fact as to whether (a) the plaintiff satisfied her "obligation to do what is necessary and reasonable in order to remain employed rather than simply quit," and (b) the employer's "failure to take adequate measures to prevent [the co-worker] from harassing Plaintiff again contributed to creating an "intolerable" situation for the plaintiff, leaving her no choice but to quit. <u>Id.</u> at 557–58.

Similarly, in <u>Shamsuddi v. Classic Staffing Servs.</u>, No. 19-cv-3261, 2020 WL 7700184 (E.D. Pa. Dec. 28, 2020), the plaintiff, an African-American man, worked for a staffing agency, which would assign him to various job sites. <u>Id.</u> at *1.  While on assignment to one of these job sites, the plaintiff called out of work because he was moving.  <u>Id.</u>  The following day, the sole recruiter from the staffing agency called to find out why plaintiff was not at work and left a message on the plaintiff's phone.  <u>Id.</u> After leaving the message, however, the supervisor did not hang up and additional statements were recorded, which included multiple uses of the word "ni\*\*ers" as well as references to "Jiggy-poo. Jig jog jiggers." <u>Id.</u> at *2.  Plaintiff did not return to work after receiving this voicemail.  <u>Id.</u>

Although this was the only incident of discrimination, the district court declined to grant summary judgment in favor of the defendant, noting that the supervisor admitted that her comments were incredibly hurtful and that she understood why a black person would not want to work for the company after hearing them.  <u>Id.</u>  at *4.  The court further found it relevant that the plaintiff could not avoid interaction with that supervisor because she was the only recruiter and was solely responsible for assigning jobs to employees.  <u>Id.</u>  Finally, the court noted that, at the relevant time, the staffing agency did not have an anti-harassment policy.  <u>Id.</u>  Ultimately, the court concluded that "[t]hese circumstances, in combination with the serious and offensive nature of the n-word would allow a

reasonable jury to find that the working conditions at [the staffing agency] 'became so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Id. (quotations omitted).

Given this legal landscape, I must now consider Plaintiff's claims that his constructive discharge was prompted by (1) discriminatory comments by Plaintiff's co-worker George, and (2) Plaintiff's discovery of the hanging monkey in an empty apartment.  Resolving all issues of material fact regarding both of these incidents in favor of Plaintiff as is required under Fed. R. Civ. P. 56, I find this case more akin to Woodard, LaRochelle, Reed (granting summary judgment) than to Nuness and Shamsuddi (denying summary judgment).

i. Offensive Comments by George

Plaintiff identifies several discriminatory comments by his co-worker George, including: (a) George's comment that Zhao would not rent to him because "she's not turning this into the hood or the ghetto"; (b) George's use of the word "ni**er" which Plaintiff acknowledged was not directed at him personally; (c) George's comment about black people loving chicken; and (d) George's sending of a racially offensive skit by African American comedian Dave Chappelle.  Plaintiff stated that he expressly told Zhao that George made racist comments, but she did nothing.  (Samuel Dep. 90:1–96:7.)

There are several factors which lead me to conclude that a reasonable factfinder could not find that these isolated comments rise to the level of severity or pervasiveness required for a constructive termination claim.

First, George was a co-worker, not a supervisor.  See Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)  ("[A] supervisor's use of the term [ni**er] impacts the work environment far more severely than use by co-equals.").  Further, like the comments in Woodard, Larochelle, and Reed, Plaintiff understood that George's use of the word "ni**er" was not directed towards him.  Indeed, Plaintiff testified that when he told Zhang about the comments, he explained that "[t]hings isn't working out with me and Alex right now.  I say, He's saying a lot of disrespectful stuff

about gay people.  I say, He disrespects me at times.  He say things I don't like.  He might not call me a ni\*\*er, but he might think it's cool to say "ni\*\*er."  (Samuel Dep. 91:19–24.)  Thus, unlike in <u>Nuness</u>, the comments, while offensive, were "used in passing to refer to some other person, object or situation" and thus are properly characterized as "stray" or "offhand."  <u>Nuness</u>, 325 F. Supp. 3d at 549; <u>see also</u> <u>Peters v. Renaissance Hotel Operating Co.</u>, 307 F.3d 535, 552 (7th Cir. 2002) ("As 'second-hand' harassment, the impact of these incidents are 'obviously not as great as the impact of harassment directed at the plaintiff.'").

Moreover, and unlike in both <u>Nuness</u> and <u>Shamsuddi</u>, Plaintiff continued working for Target Realty for more than two months after these statements were made.  Both during after this time period, Plaintiff continued to text regularly with George, and the texts reflect friendly exchanges regarding work and sometimes personal matters.

Given this factual record, no reasonable jury could find, under an objective standard, that George's comments were so severe as to compel Plaintiff to leave his employment.  (Pl.'s Ex. M.)

ii.    <u>The Hanging Monkey</u>

The second incident on which Plaintiff premises his constructive discharge claim is Plaintiff's allegation regarding Zhao's delay in removing the stuffed monkey.  According to Plaintiff's testimony, when he entered an empty rental unit to clean it, he found a stuffed monkey hanging from a noose.  Plaintiff called Zhao, George, another individual with Target Realty, and the police to describe the incident.  Plaintiff specifically told Zhao that the display was "racist" and that "being a black man, I'm not taking it down.  (Samuel Dep. 256:17–20.)  A few days later, Mr. Hung, the maintenance man, showed up at Zhao's request, but when he arrived, he simply laughed and pointed at Plaintiff and said, "It looks like you."  (<u>Id.</u> at 225:2–10.)  He did not take down the monkey.  Plaintiff checked back on the apartment every day from August 5th to August 11th, when he noticed that someone had added a banana to the monkey.  Eventually, after thirty days of the monkey remaining in the apartment, Plaintiff informed Zhao that he would not be returning to work.

While undoubtedly a disturbing and offensive incident, this event does not rise to the level of an employer's knowing permission of conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.  Several reasons guide my decision.

First, unlike in Nuness and Shamsuddi where summary judgment was denied, there are no facts of record tying the placement of the stuffed monkey to Zhao or anyone related to the Defendant company.  Indeed, Plaintiff affirmatively testified that Zhao never said anything discriminatory to him and that he did not think that Zhao hung the monkey or wanted this to happen.  (Samuel Dep. 224:14–22, 246:11–13; see also id. at 62:3–9.)  Plaintiff also stated that although he complained to Zhao about feeling overwhelmed by the amount of work, he never complained to her that she was discriminatory.  (Samuel Dep. 89:1–24.)   And there is no evidence, or reasonable inference, that George was responsible for the monkey placement.  Rather, Plaintiff's sole complaint was that, like in Woodard, his employer failed to promptly remedy the situation.

Second, there is no proof, like there was in Nuness and Shamsuddi, that the racial incident was specifically directed at Plaintiff.  In fact, the evidence reflects only that the monkey was left by an unknown person in a vacant rental unit.

Third, unlike in Nuness and Shamsuddi, there is no evidence that Plaintiff was forced to continue to work with anyone who left the stuffed monkey as, again, it is unknown who the perpetrator was.  And, unlike Shamsuddi, Plaintiff was not placed in a situation where he could not avoid interaction with the offender.  In fact, there is no evidence that Plaintiff was ever forced to go back to the apartment where the stuffed monkey was displayed.

Finally, in contrast to Nuness and Shamsuddi, Plaintiff did not leave almost immediately after his discovery of the stuffed monkey, but rather remained at his job for another month.   While Plaintiff internally committed to quitting if the monkey stayed up for thirty days, he never informed Zhao—or anyone else—of his intentions or made any other efforts to remediate the situation.  (Id. at 260:24–261:17.)  In fact, within minutes of Plaintiff's singular text message to Zhao of the picture of the

27

monkey, Plaintiff texted with Zhao about other, unrelated work items.  Over the next thirty days, and despite repeated text conversations with Zhao, Plaintiff made no additional mention of the monkey incident.  (Defs.' Ex. H, 54–66.)  Likewise, aside from one text to George on the day of the incident, Plaintiff never raised the monkey incident again in any of his frequent text exchanges with George.  (Pl.'s Ex. M.)  As the Third Circuit has noted, a reasonable employee will usually explore alternative options before concluding that "resignation is the only option," and, although an employee is not required to take such steps in all cases, the employee should "be able to show working conditions were so intolerable that a reasonable employee would feel forced to resign without remaining on the job for the period necessary to take those steps."  Clowes, 991 F.2d at 1161 n.16.

Viewed in the light most favorable to Plaintiff, the undisputed record does not reflect that Plaintiff, as an objectively reasonable employee, felt forced to resign at the time of or shortly after the monkey incident.  Even considering the incident in conjunction with George's previous, stray racial remarks, the evidence is insufficient for a reasonable factfinder to conclude that the monkey incident was the breaking point in a racially-charged environment.  Likewise, there is no evidence of additional incidents of discrimination or continuing hostility in the interim between the monkey incident and Plaintiff's decision to leave.  And finally, the record is devoid of any evidence that Plaintiff explored any alternative options or re-raised his concerns with Zhao at any point after his singular text to her.  As such, and considering all inferences in Plaintiff's favor, a reasonable jury could not conclude that any discriminatory incident rendered Plaintiff's working conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign.  Accordingly, I will grant Defendants' Motion for Summary Judgment on this claim.

### C.   Hostile Work Environment

Plaintiff also presses a retaliatory hostile work environment theory.  The United States Supreme Court has explained "[w]orkplace conduct is not measured in isolation," so when a workplace "is permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001), and Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  To succeed on a hostile work environment claim, the plaintiff must establish that (1) the employee suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4)   the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability.  Mandel, 706 F.3d at 167.

"The inquiry into whether the discriminatory or retaliatory environment was 'severe or pervasive' recognizes that less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus, and one severe incident may be enough to create a hostile work environment." Komis v. Sec'y of U.S. Dept. of Labor, 918 F.3d 289, 293-94 (3d Cir. 2019).  "The 'severe and pervasive' element requires [a plaintiff] to show that her work environment became so abusive because of the discriminatory actions by her supervisors and co-workers that it changed the very nature of her employment." Komis v. Perez, No. 11-cv-6393, 2014 WL 3437658, at *2 (E.D. Pa. July 15, 2014).   "To judge whether such an environment is hostile or abusive, [a court] must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. at 271.

Where the hostile work environment is perpetrated by co-workers rather than supervisors, the Third Circuit has made clear that "[a]n employer may be liable under Title VII for retaliatory

harassment only if the *prima facie* case is satisfied and if there is a basis for employer liability for the co-worker's conduct."   Moore v. City of Phil., 461 F.3d 331, 349 (3d Cir. 2006).   "There is such a basis for liability where supervisors 'knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action' to stop the abuse."   Id. (quotation omitted).

Here, as noted above, Plaintiff concedes that Zhao never said or did anything discriminatory towards him.   Rather, he claims that the hostile work environment was perpetrated by his co-worker George and an unknown individual who hung the stuffed monkey, and that he informed Zhao about these incidents.

While I recognize that the standard for hostile work environment is lower than that for constructive discharge, the analysis and review of the uncontested facts applies equally to a hostile work environment claim.   Indeed, the cases of Woodard, LaRochelle, Reed all used a hostile work environment standard.   Certainly, the incidents described by Plaintiff were offensive.   Nonetheless, I find that a reasonable factfinder could not conclude these incidents were severe or pervasive as to render Plaintiff's work environment so abusive that it changed the very nature of his employment. Indeed, following the monkey incident, Plaintiff carried on his daily business for another month, frequently texting with both Zhao and George in casual fashion.   And there are no facts indicating that Plaintiff was forced, as part of his job, to frequent the vacant apartment where the stuffed monkey was displayed.   Nor does Plaintiff allege that any other acts of discrimination occurred during that month. Considering all the evidence regarding the alleged discriminatory events together and in the light most favorable to Plaintiff, I will grant summary judgment in favor of Defendants on this claim.

### D.      Retaliation Claims

To establish a *prima facie* case of retaliation, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."   Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995).  If the employee

establishes this *prima facie* case of retaliation, the familiar <u>McDonnell Douglas</u> approach applies in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500–01 (3d Cir. 1997). To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994).

For purposes of the first prong of a *prima facie* case of retaliation, protected "opposition" activity includes not only an employee's filing of formal charges of discrimination against an employer but also "informal protests of discriminatory employment practices, including making complaints to management." <u>Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.</u>, 450 F.3d 130, 135 (3d Cir.2006) (quoting <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir.1990)). That is, in determining whether a plaintiff adequately opposed discrimination, "we look to the message . . . conveyed [by a plaintiff's conduct] rather than the means of conveyance." <u>Moore</u>, 461 F.3d at 343 (quoting <u>Curay–Cramer</u>, 450 F.3d at 135). The opposition must be to discrimination based on a protected category, such as age or race. <u>Daniels v. Sch. Dist. of Phila.</u>, 776 F.3d 181, 193 (3d Cir. 2015). Furthermore, in making the opposition, the plaintiff must have an "objectively reasonable belief" that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute. <u>Id.</u> at 193–94.

Under the second element of the *prima facie* case, the United States Supreme Court has held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe. Ry. Co. v. White</u>, 548 U.S. 53, 77 (2006) (internal quotations omitted); <u>see also</u> <u>Yarnall v. Phila. Sch. Dist.</u>, 57 F. Supp. 3d 410, 433 (E.D. Pa. 2014). This is an objective standard which is judicially

administrable.  Burlington N., 548 U.S. at 68.   "[N]ormally, petty slights, minor annoyances, and simple lack of good manners" will not deter victims of discrimination from complaining to the EEOC.  Id. (citing 2 EEOC 1998 Manual § 8, p. 8–13). Rather, a change is materially adverse when it rises to the level of "a termination of employment, a demotion evidence[d] by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices unique to a particular situation."  Raffaele v. Potter, No. 09-3622, 2012 WL 33035, at *4 (E.D. Pa. Jan. 6, 2012).

Finally, "[a] plaintiff asserting a claim of retaliation has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination."  Carvalho–Grevious v. Del. State Univ., 851 F.3d 249, 257–58 (3d Cir. 2017) (citing 42 U.S.C. § 2000e-2(m)).  This third element requires that a plaintiff identify "what harassment, if any, a reasonable jury could link to a retaliatory animus."  Jensen v. Potter, 435 F.3d 444, 449--50 (3d Cir. 2006).  A plaintiff must prove that the retaliatory animus had a "determinative effect" on the employer's decision to subject the employee to adverse employment action.  Woodson v. Scott Paper Co., 109 F.3d 913, 932 (3d Cir. 1997).  "To prove a 'determinative effect,' the plaintiff must show 'by a preponderance of the evidence that there is a "but-for" causal connection' between the adverse employment action and the retaliatory animus."  Carvalho–Grevious, 851 F.3d at 258 (quotations omitted).

Plaintiff has failed to adduce evidence to create a genuine issue of material fact as to any of these elements. First, as to protected activity, Plaintiff alleges that although he complained to Zhao about his working conditions on six or seven occasions, he never complained that he was being discriminated against based on his race.  (Samuel Dep. 89:6–24.)

Second, to the extent Plaintiff alleges any protected activity in the form of his complaints to Zhao about (a) George's racially discriminatory actions and (b) the monkey incident, Plaintiff fails to set forth any material adverse action that occurred as a result.  Zhao's disregard of the exchanges between George and Plaintiff and inaction with respect to the monkey are mere failures to act.  They

do not rise to the level of "a termination of employment, a demotion evidence[d] by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices unique to a particular situation." Raffaele, 2012 WL 33035, at *4. Stated differently, Zhao's lack of response to complaints does not constitute an affirmative retaliatory action alleged that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

As such, I will grant summary judgment on this claim.

### E.      Aiding and Abetting Discrimination Claims Against Zhao

Finally, Defendants move for summary judgment on Plaintiff's claims for aiding and abetting discrimination against Defendant Zhao.

The PHRA provides in pertinent part:

> It shall be an unlawful discriminatory practice ... [f]or any person, employer, employment agency, labor organization or employee, to aid, abet, [or] incite . . . the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act ..., or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

42 Pa. Stat. § 955(e).  While § 955(e) extends liability to any individual who aids and abets the alleged discrimination, "only supervisory employees, not co-workers, can be held liable under § 955(e)," based on the theory that only supervisory employees "can share the discriminatory purpose and intent of the employer that is required for aiding and abetting." Carlton v. City of Phila., No. 03-cv-1620, 2004 WL 633279, at *8 (E.D. Pa. Mar. 30, 2004).

"For liability to be imposed on an aiding and abetting theory, however, there must be a cognizable predicate offense," i.e. a violation by the employer of the PHRA's primary anti-discrimination provision. Dickinson v. Millersville Univ. of Pa., No. 13-cv-5022, 2014 WL 1327610, at *5 (E.D. Pa. 2014).  "Individual defendants cannot violate PHRA section 955(e) when there is no

corresponding section 955(a) violation by an employer to aid and abet." <u>Burgess–Walls v. Brown</u>, No. 11–275, 2011 WL 3702458, at *6 (E.D. Pa. Aug. 22, 2011) (quotation omitted).

As set forth above, Plaintiff's claims for discrimination and retaliation do not survive summary judgment, meaning there is no violation of any anti-discrimination provision either under the PHRA or the Philadelphia Fair Practices Ordinance.  Absent a predicate offense which Zhao is alleged to have aided and abetted, a separate count for aiding and abetting cannot survive.

## IV.    CONCLUSION

The racial epithets and events alleged by Plaintiff, if true, are unacceptable and should never be condoned.  Nonetheless, under the facts specific to this case, no reasonable factfinder could find that such events give rise to liability against Defendants under Title VII, § 1981, the PHRA, or the Philadelphia Fair Practices Ordinance.  Accordingly, I will grant summary judgment in favor of Defendants and dismiss the entirety of the Complaint.